## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS FREEMAN, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.  12-1422 |
| PHILADELPHIA HOUSING | : | |
| AUTHORITY, FRED PASOUR, and | : | |
| STACEY THOMAS, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

BUCKWALTER, S.J.                                                                July 18, 2013

Currently pending before the Court are (1) Plaintiff Thomas Freeman's Motion for

Summary Judgment; (2) Defendants Philadelphia Housing Authority ("PHA") and Stacey

Thomas's Motion for Summary Judgment; and (3) Defendant Fred Pasour's Motion for

Summary Judgment.  For the following reasons, Plaintiff's Motion is denied in its entirety,

Defendants Philadelphia Housing Authority and Thomas's Motion is granted in its entirety, and

Defendant Pasour's Motion is granted in its entirety.

## I.      FACTUAL BACKGROUND[1]

### A.      The Parties

Plaintiff Thomas Freeman was born on July 13, 1959, and suffers from diabetes.

---

[1]  The factual history is compiled from a review of the briefs submitted by all of the
parties, together with their supporting exhibits.  Notably, many of the exhibits were filed by more
than one of the parties, leaving the Court with duplicates of the same document.  The Court's
citation of an exhibit from only one party's materials is simply a matter of convenience and shall
not be construed to suggest that any additional consideration was given to that party's briefing.

(Deposition of Thomas Freeman ("Freeman Dep."), 12:12–13, Feb. 12, 2013.)  Plaintiff received his associates degree from Community College in May of 1980, his bachelor's degree from the Philadelphia College of Textile and Science in December 1985, and his master's in business administration from the University of Phoenix in November of 2008.  (Id. at 12:22–13:5.)

Plaintiff was originally hired by Defendant Philadelphia Housing Authority ("PHA") in May or June of 1982.  (Id. at 13:6–12.)  The Philadelphia Housing Authority deems itself "the biggest landlord in Pennsylvania" that "develop[s], acquire[s], lease[s] and operate[s] affordable housing for city residents for limited incomes."  (Pasour Mot. Summ. J., Ex. 3.)  It houses nearly 80,000 people in the City of Philadelphia and employs 1,406 people to deliver services to its clients.  (Id.)

Defendant Frederick Pasour, Esquire was born on May 3, 1969, and graduated the University of Albany in New York in 1991.  (Deposition of Fred Pasour ("Pasour Dep."), 6:21–23, Mar. 20, 2013.)  He then attended law school at the University of Dayton, from which he received a juris doctorate degree in 1994.  (Id. at 6:24–7:1.)  Thereafter, he held several positions, including one year at the Legal Aid Society of Northern Pennsylvania, two and a half years at the Law Firm of Freedman and Lorry, and four years with the City of Philadelphia Law Department.  (Def. Pasour's  Mot. Summ. J., Ex. 8, Resp. to Interrog. No. 4.)  Mr. Pasour was hired by PHA in June 2003, in the position of Labor Counsel, where he was responsible for advising PHA personnel on labor and employment issues, overseeing the Workers' Compensation Department, overseeing all the implementations of the Collective Bargaining Agreement, overseeing the EOC Department, supervising outside litigation, and attending internal grievance meetings.  (Pasour Dep. 7:2–4, 10:16–25.)  In 2005, Mr. Pasour became the

2

Director of Labor and Employment and remained in that position until he was appointed Acting

General Counsel for Labor and Employment in 2008.  (<u>Id.</u> at 12:11–13:8.)  As Acting General

Counsel, Pasour had a staff of four people, including Defendant Stacey Thomas.  (<u>Id.</u> at

16:19–17:1.)  As of December 2008, Pasour formally became the General Counsel for Labor and

Employment and remained in that position through May 28, 2011.  (Pasour Mot. Summ. J., Ex.

8, Resp. to Interrogatory No. 5.)  In that role, the administration of FMLA and Medical Leaves of

Absence ("MLOA") came within his oversight.  (Pasour Dep. 107:25–108:4.)  Nonetheless, all

final decisions regarding FMLA and MLOA leaves were made by his supervisor.  (Pasour Mot.

Summ. J., Ex. 10, Aff. of Frederick Pasour ("Pasour Aff."), ¶ 4, May 22, 2013.)  As General

Counsel for Labor and Employment, Pasour directly reported to Carolynn Carter, who was the

Assistant Director of Operations and who ultimately reported to Executive Director Carl Greene.

(<u>Id.</u> ¶ 3.)

Defendant Stacey Thomas graduated from high school in 1980 and attended two years of

Community College.  (Deposition of Stacey Thomas ("Thomas Dep."), 5:12–6:6, 20, Mar. 14,

2013.)  She was originally employed as a clerk for Rockville Insurance Company and then at

Raleigh and Plumbing Adjusters, until she was hired, in February 1994, by PHA.  (<u>Id.</u> at

6:7–7:20.)  Originally, she served as a communications operator in the police radio room, but left

eight months later for a position in the risk management department as a workers' compensation

coordinator.  (<u>Id.</u> at 7:21–10.)  Finally, in November 2000, Thomas went to the Labor Relations

Department of PHA in the position of Labor and Employment Specialist, where she remains to

date.  (<u>Id.</u> at 9:19–10:10.)  In that role, she administers workers' compensation and serves as the

liaison between PHA and its unions.  (<u>Id.</u> at 3:3–5.)  In March of 2006, she began administering

the FMLA leave policies.  (Id. at 10:5–7, 11:2–25.)  From 2006 to 2011, Thomas's direct

supervisor was Pasour, until Audrey Lim took over in February 2011.  (Id. at 12:21–13:5.)

During this period of time, Thomas was responsible for notifying employees of their rights under

the FMLA.  (Id. at 13:13–16.)  She explained the process, upon receipt of a request for FMLA

leave, as follows:

> An employee would send their notice of rights and responsibilities as well as a
> medical certification to be completed by their treating physician.  That was sent back
> to me within 15 days.  Once I received it, I went to my supervisor and we reviewed
> it.  If my supervisor says it was okay to approve it, I actually put together a
> designation letter.  I signed it.  My supervisor signed, and it went to the employee.

(Id. at 13:22–14:14.)  Thomas was "a sole contact for employees who went out on leave."  (Id. at

12:9–10.)  Ultimately, her supervisor made the decision as to whether an employee got FMLA.

(Id. at 14:20–22; see also id. at 31:3–32:9.)

### B.    PHA's Leave Policies

PHA maintains a Family and Medical Leave Act Policy which grants eligible employees

up to twelve weeks of unpaid, job-protected leave each year for specified family and medical

reasons.  (Def. Pasour's  Mot. Summ J., Ex. 4.)  Employees seeking to use FMLA leave are

required to provide (1) thirty-day notice of the need to take FMLA leave when the need is

foreseeable; (2) medical certifications supporting the need for leave due to a serious health

condition affecting the employee or an immediate member of his/her family; (3) periodic reports

during FMLA leave regarding the employee's status and intent to return to work; and (4)

scheduling of treatment to avoid disruption of PHA's operation when only intermittent leave is

planned.  (Id.)  The employee is also required to "use accrued paid leave (such as sick or vacation

leave) to cover some or all of the FMLA leave."  (Id.)  Upon return from FMLA leave, the

4

employee "must be restored to his or her original job, or to an equivalent job with equivalent pay, benefits, and other employment terms and conditions." (Id.)  Further, the use of FMLA cannot result in the loss of any employment benefits that the employee earned or was entitled to prior to taking FMLA leave.  (Id.)  Plaintiff was aware of PHA's Family Medical Leave Policy. (Freeman Dep. 30:24–31:7.)

In addition to the FMLA policy, PHA maintains a Leave of Absence Policy ("MLOA Policy"), which allows an employee to take an unpaid leave for temporary physical or mental incapacity, training related to an employee's regular duties in an approved educational institution, military service, or other personal reasons.  (Pasour Mot. Summ. J., Ex. 5.)  A full-time regular employee with one to five years of continuous service with the PHA is eligible to apply for an unpaid leave of absence for up to five months in any twelve month period, while an employee with over five years of continuous service can apply for unpaid leave for a period of up to nine months in any twelve month period.  (Id.)  Notably, the MLOA runs concurrently with the FMLA and, if eligible, an employee may receive six additional months of leave.  (Id.)  The MLOA Policy provides, however, that "[i]n cases of severe personnel shortage or periods of emergency, leaves of absence may be restricted in the interest of the Philadelphia Housing Authority (PHA)." (Id.)[2]

**C.      Plaintiff's Employment with the PHA and History of His FMLA Leave**

Plaintiff commenced his employment at PHA in the spring of 1982 as a manager trainee.

---

[2]  Plaintiff's recitation of facts in his Motion for Summary Judgment includes a description of the new PHA medical leave policies that took effect on July 16, 2012.  While the Court agrees that these new policies would have been more favorable to Plaintiff's situation, such policies were not in effect during the pertinent events in this case and, thus, are not relevant.

(Freeman Dep. 13:6–21.)  In 1997, he became an asset manager and his immediate supervisor

was Pam Dunbar.  (Id. at 14:5–17.)  His position within PHA never changed after that time, (id.

at 14:8–23), although his supervisor went from Miss Dunbar to Juanita Maiga from 2006 to

2009, and then to Jackie Gardner from 2009 forward.  (Id. at 14:24–16:10.)  Walter Norris was

the lead manager in the office where Plaintiff worked.  (Id. at 17:2–13.)  During the post-2006

period, either Ms. Maiga, Ms. Gardner, or Mr. Norris gave Plaintiff work assignments, managed

his sick and vacation day requests, and handled any necessary supervision or discipline.  (Id. at

18:9–19:3.)  If he needed to call out sick, he would call into the office to speak to Mr. Norris.

(Id. at 18:18–22.)  If he wanted to take a vacation day, he would fill out a leave slip, Mr. Norris

would sign it, and then it would go to Ms. Maiga.  (Id. at 18:23–19:3.)  If Plaintiff performed any

of his duties incorrectly, either Mr. Norris or Ms. Maiga would speak to him.  (Id. at 19:4–12.)

Defendant Pasour did not supervise Plaintiff at all or control any aspects of his employment,

including assignments, scheduling, vacation time, or pay rate.  (Id. at 46:18–47:8.)

    In June 2003, Plaintiff requested and was granted FMLA leave from PHA.  (Id. at

111:20–112:16; Def. PHA's Mot. Summ. J., Ex. T.)  Upon receipt of Plaintiff's request for leave,

PHA sent Plaintiff a designation letter to his home address, notifying him of his rights under the

FMLA and requesting that he submit his medical certification form.  (Id., Ex. X.)  Plaintiff

complied with this requirement and submitted the requested certification form to the PHA, which

stated that he would be unable to work for six to eight weeks.  (Id., Ex. W.)  Plaintiff was

ultimately approved for eight weeks of FMLA leave from June 16, 2003 to August 11, 2003.

(Id., Ex. X.)  Subsequently, as required by the PHA, Plaintiff submitted a note from his treating

physician stating that he was able to return to work as of August 11, 2003.  (Id., Ex. V.)  He was

6

then approved by the PHA's physician to return to work and was reinstated to his previous

position.  (<u>Id.</u>, Ex. U; Freeman Dep. 118:11–119:11.)

Plaintiff also requested and received FMLA leave in 2005 due to his need for diabetic eye

surgery.  Plaintiff requested leave and PHA sent him a notice similar to the one sent with respect

to the 2003 leave.  (Freeman Dep. 119:19–121:11.)  Plaintiff followed the same procedures as

before by sending in a medical certification.  (<u>Id.</u> at 121:19–123:24.)  PHA again approved his

leave, this time for a period running from August 3, 2005 to October 25, 2005.  (<u>Id.</u> at

124:4–125:18.)

Plaintiff took FMLA leave a third time in 2006 due to an acute and chronic ulcer that

required surgical intervention.  (<u>Id.</u> at 128:19:–130:10.)  That leave period expired on August 7,

2006.  (<u>Id.</u> at 130:20–131:2.)  PHA informed him that, in order to return to work, he was required

to present a full duty release from his physician—a requirement with which he complied.  (<u>Id.</u> at

131:5–133:13.)

**D.**     **Plaintiff's 2009 FMLA Leave**

In June 2009, Plaintiff began experiencing difficulties in his left leg in connection with

his ongoing diabetic condition.  (<u>Id.</u> at 19:24–20:15.)  On June 5, 2009, he was in the office

talking to a man named William Burns and told him he was not feeling well.  (<u>Id.</u> at 20:18–21:1.)

At about 4:15 or 4:30, Burns, who was a manager, told him to go home.  (<u>Id.</u> at 21:3–17.)  The

next day, Plaintiff went to Temple Hospital, where he was admitted due to complications with

his leg.  (<u>Id.</u> at 21:20–22:2.)  A specialist met with Plaintiff and explained that he required

emergency surgery.  (<u>Id.</u> at 22:3–5.)  On June 7, 9, and 11, 2009, Plaintiff had amputation surgery

on his toes.  (<u>Id.</u> at 22:6–23:20.)

Sometime between June 7 and June 8, Plaintiff spoke with Defendant Thomas to inform her that he had had surgery and that he was to undergo two more surgeries.  (Id. at 24:13–25:4; Thomas Dep. 89:7–23.)  Thomas stated that she was going to have FMLA papers brought to him in the hospital and, subsequently, sent him a letter dated, June 8, 2009, detailing his FMLA rights and providing a medical certification for him to return.  (Freeman Dep. 25:5–21; Thomas Dep. 90:19–91:20, Def. Pasour's Mot. Summ. J., Ex. 13.)  In addition, Thomas completed an MLOA form on Freeman's behalf, effective June 8, 2009, because the MLOA leave was going to run concurrently with the FMLA.  (Thomas Dep. 97:19–99:22.)  Plaintiff received and completed these papers, and his sister, who was also a PHA employee, returned them to Thomas.  (Freeman Dep. 26:15–18.)  Plaintiff's physician completed the Certification of Healthcare Provider indicating that Plaintiff would be incapacitated for three to four months due to his amputation. (Def. Pasour's Mot. Summ. J., Ex. 15; Thomas Dep. 101:23–104:6.)  Shortly afterwards, Thomas told Plaintiff that she received the papers and that he should focus on getting himself better health-wise.  (Freeman Dep. 27:16–20.)  According to Plaintiff, Thomas did not inform him of the status of his FMLA request, but told him that PHA was going to use his sick and vacation time, of which he had approximately six months combined.  (Id. at 27:21–28:22.)  In addition, Plaintiff alleges that Thomas told him that he had up to a year to come back to work.  (Id. at 28:21–29:7.)

On June 23, 2009, Thomas completed Plaintiff's Request for Leave of Absence Form and designated his leave period from June 8, 2009 to August 31, 2009.  (Def. Pasour's Mot. Summ. J., Ex. 16; Thomas Dep. 105:3–108:13.)  In addition, Plaintiff's MLOA leave was approved to run concurrently with his FMLA leave.  (Thomas Dep. 112:3–113:6.)  Thomas sent Plaintiff a

letter, dated June 26, 2009, informing him that he had been approved for FMLA leave from June 8, 2009 to August 31, 2009.  (Def. Pasour's Mot. Summ. J., Exs. 17, 18.)  Plaintiff recalls receipt of this letter.  (Freeman Dep. 35:17–39:17.)

Subsequently, at the end of June or beginning of July 2009, Plaintiff was transferred out of Temple Hospital to Hopkins Rehabilitation for approximately twenty days.  (Freeman Dep. 191:5–193:15.)  At that point, he was fitted for a boot, which enabled him to walk without other assistance.  (Id. at 191:12–193:5.)  In mid-July, he was released from Hopkins and he returned to his house.  (Id. at 193:10–194:4.)

Prior to the expiration of his leave, Plaintiff's sister Joyce contacted an employee in the Labor Relations Department on August 24, 2009, to advise that Plaintiff needed an extension of his FMLA leave because of a foot amputation.  (Def. Pasour's Mot. Summ. J., Ex. 21; Thomas Dep. 124:8–127:4.)  Thereafter, on August 28, 2009, Thomas sent an e-mail to Defendant Pasour stating:

> Fred,
> Per our conversation, Mr. Freeman was hospitalized on 6/8/09.  He was approved for FMLA for the period of 6/8–8/31/09.  On 8/24/09 our office was contacted by Mr. Freeman's sister requesting an extension of his leave.  Mr. Freeman is currently admitted into the hospital.
>
> Please advise if an extension will be approved.

(Pl.'s Mot. Summ. J, Ex. 12.)  Thomas explained that this e-mail was sent because Plaintiff's FMLA leave was about to expire and he would now need a Medical Leave of Absence, which required Pasour's approval.  (Thomas Dep. 127:3–19.)  Pasour, however, told her to "put [a response] on hold" and he would get back to her.  (Id. at 127:20–128:7.)  Pasour did not get back to her until a "few months" later, in December of 2009.  (Id. at 128:19–129:3.)  According to

Plaintiff, he was still not aware, at that juncture, that he was on FMLA leave.  (Pl.'s Mot. Summ. J., Ex. 13, Aff. of Thomas Freeman ("Freeman Aff.") ¶¶ 12–13, May 10, 2013.)  He also claims that he did not know that his sister contacted PHA with regard to his FMLA leave.  (Freeman Dep. 151:11–153:8.)

Plaintiff's FMLA leave expired on August 31, 2009.  (Def. Pasour's Mot. Summ. J., Ex. 18.)  On September 11, 2009, Thomas sent Plaintiff a letter to his home address, via certified mail, notifying him, as follows:

> Please take notice that your Family and Medical Leave Act ("FMLA") entitlement expired at the close-of-business, **Monday August 31 2009**[.] [A]s a result, your ***"return date"*** is **Friday, September 18, 2009.**  For purposes of your return to your position, you should contact Labor Relations immediately in order to schedule your return to work physical at Northeastern Hospital.  You will be required to present a fully duty release from your physician.  Please contact Labor Relations to schedule your physical.
>
> Should you fail to appear for work on your return date or request a leave extension, you will be considered a "voluntary quit" and separated from the payroll.
>
> If you have any questions, please contact me at [deleted].

(Def. Pasour's Mot. Summ. J., Ex. 1 (emphasis in original).)  Plaintiff's sister signed for receipt of the letter on his behalf.  (Freeman Dep. 153:15–154:17.)  Although Plaintiff contends that he never saw this letter, he does not dispute that the letter was sent to and received at his home address.  (Id. at 155:22–156:11.)

Plaintiff claims that as of September 18, 2009, he was able to go back to work, but nonetheless did not return to work on that date.  (Id. at 155:11–21.)  Moreover, Plaintiff's physician submitted a note to PHA, dated September 2, 2009, stating that Plaintiff "will be unable to work for 4 months because of complications."  (Def. Pasour's Mot. Summ. J., Ex. 20.)

10

At his deposition, Plaintiff disagreed with his physician's assessment and asserted that he was able to walk and thus able to return to work.  (Freeman Dep. 158:9–159:12.)  During this period of time following the expiration of FMLA leave, Thomas continued to keep Plaintiff on payroll because he had available sick and vacation time, even though Plaintiff had not yet obtained approval for a Medical Leave of Absence.  (Thomas Dep. 129:4–132:17.)

On September 28, 2009, Thomas received a phone call from Plaintiff regarding his leave.  (Thomas Dep. 157:18–158:15.)  Following this conversation, Thomas drafted a note that appeared on Plaintiff's "Employee Leave of Absence Form."  It stated, "Received a call from [Freeman] - he has been in the hosp. and unable to get his mail.  He is having difficulty w/his heart - he lost his leg and is in dyalisis [sic].  [Freeman] stated that this should be covered under ADA."  (Pl.'s Mot. Summ. J., Ex. 15.) According to Thomas, she told Plaintiff that she would have to contact Pasour to let him know the situation.  (Thomas Dep. 158:21–159:1.)  When she contacted Pasour, he advised her to put Plaintiff's termination on hold.  (Pl.'s Mot. Summ. J., Ex.15; Thomas Dep. 160:11–163:13.)  She did not communicate this to Plaintiff because she was again "waiting for Mr. Pasour to get back" to her.  (Thomas Dep. 163:14–19.)

Plaintiff testified that he spoke with Thomas in October 2009 regarding a return to work.  (Freeman Dep. 43:6–14.)  She replied that she would have to set him up with an appointment with the PHA physician before he could come back to work, but would have to talk to Pasour.  (Id. at 43:15–20.)  He told Thomas he was "willing, ready, and able to go back to work."  (Id. at 43:23–24.)  Subsequently, in November 2009, he spoke with Pasour for the first time.  (Id. at 46:2–12, 48:20–23.)  Pasour simply asked him if he could walk and Plaintiff replied that he

11

could—there were no discussions regarding any leave of absence.[3]  (Id. at 48:20–49:16.)

In December of 2009, Thomas had a discussion with Pasour regarding Plaintiff's continued absence from work.  She stated that Plaintiff was still out of work and that the extended Medical Leave of Absence (which had never formally been approved) would expire in February.[4]  (Thomas Dep. 142:21–143:23, 167:11–168:16.)  Plaintiff claims that he then received another call from Pasour in January 2010, asking how he was doing.  (Freeman Dep. 49:19–22.)  When Plaintiff said he was doing better, Pasour stated, "Well, you know Mr. Greene [Executive Director of the PHA] don't like people like you hanging around."[5]  (Id. at 49:23–50:7.)  Plaintiff did not know what Pasour meant by this and did not ask him.  (Id. at 50:8–10.)

### E.    Plaintiff's Termination

Sometime in early February 2010, Defendant Pasour had a conversation with Assistant Executive Director of Operations Carolyn Carter regarding Plaintiff's status.  (Pasour Dep. 51:4–18.)  Ms. Carter called Pasour for an in-person meeting in her office, at which time he informed her that Plaintiff had exhausted his FMLA leave.  (Pasour Dep. 51:19–52:22.)  Thereafter, Ms. Carter gave Pasour directions to find out whether Plaintiff could return to work

---

[3]  Pasour denies that he ever initiated a phone call to Plaintiff and specifically denies asking Plaintiff if he was able to walk.  (Def. Pasour Resp. Opp'n Mot. Summ. J., Ex. 1, Second Aff. of Frederick Pasour ("Second Pasour Aff."), ¶ 9.)

[4]  Thomas assumed that Plaintiff's MLOA started on June 8, 2009—the same date as his FMLA leave—and ran for eight months, meaning that it expired on February 8, 2010.  (Thomas Dep. 168:18–169:4.)  Notably, however, the PHA's MLOA Policy allowed for Plaintiff to receive nine months of MLOA leave, meaning that any MLOA leave received by Plaintiff leave should have actually expired in March, 2010.  (Pasour Dep. 66:16–67:23.)

[5]  Again, Pasour denies ever initiating a phone call to Plaintiff and specifically denies making the comment about Mr. Greene.  (Second Pasour Aff ¶ 10.)

and, if he could not return to work, to terminate him.  (Pasour Dep. 51:15–16, 55:12–14, 61:19–23, 64:9–17.)  Following up on these directions, Pasour sent Plaintiff a return-to-work letter dated February 4, 2010.  (Pasour Mot. Summ. J., Ex. 23, Pasour Dep. 56:10–58:16.)  That letter stated:

> Please take notice that your Family and Medical Leave Act ("FMLA") entitlement expired, therefore your *"return date"* is **Monday, February 8, 2010.**  For purposes of your return to your position, you should contact Labor Relations immediately in order to schedule your return to work physical at Northeastern Hospital.  You will be required to present a full duty release from your physician.  Please contact Labor Relations to schedule your physical.
>
> Should you fail to appear for work on your return date or request a leave extension, you will be considered a "voluntary quit" and separated from the payroll.
>
> If you have any questions, please contact me at [deleted].

(Pasour Mot. Summ. J, Ex. 23 (emphasis in original).)  Plaintiff concedes that he received this letter.  (Freeman Dep. 55:10–57:8.)  He also concedes that, having taken FMLA before, he knew he had to get a physical before he returned.  (Id. at 197:19–22.)

Upon receipt of this letter, Plaintiff called Thomas approximately "five or six times," but only spoke to her "two to three times" in an effort to schedule his physical.  (Id. at 198:2–18.)  When he first spoke to her, he asked when she was going to set him up for an appointment for the return to work, to which she again indicated that she needed to speak with Pasour.  (Id. at 198:19–199:5.)  He followed up with her after two to three days and, for a second time she stated that she needed to talk to Pasour.  (Id. at 199:11–3.)  Plaintiff never personally spoke with Pasour regarding the scheduling of a physical.  (Id. at 200:21–201:1.)

On February 8, 2010, Plaintiff's treating foot surgeon, William Martin, faxed a letter to Thomas, indicating as follows:

> The above [Thomas Freeman] has been a patient of mine since 6/6/09.  He continues to be under my active care.  He is also seeing Dr Alan Meltzer.  Mr. Freeman suffered a severe infection resulting in amputation.  He continues with would healing problems and cannot be fitted with a prosthesis until the wound problems are resolved.  He is unable to work and has been since 6/6/09.  I would anticipate that this (unable to work) will continue at least another 6 months.   If additional information is needed contact me directly.

(Def. Pasour's Mot. Summ. J., Ex. 24; Freeman Dep. 64:3–67:8; Thomas Dep. 204:20–205:12.)

At his deposition, however, Plaintiff maintained that he could return to work because he had a boot and was walking.  (Freeman Dep. 67:9–20.)  Plaintiff admitted, however, that he never gave either Mr. Pasour, Ms. Thomas, or anyone else at PHA a document from any of his physicians indicating that he could return to work.  (Id. at 244:7–247:12.)

> On February 17, 2010, Pasour sent Plaintiff a letter indicating as follows:

> Please take notice that your Family Medical Leave of Absence ("FMLA") has expired.

> On February 3, 2010 you were notified of the expiration of your leave and advised that if you failed to appear on the return to work date you would be considered a "voluntary quit" and separated from the payroll.

> Accordingly, your termination date is **Friday, February 19, 2010**.

(Pasour Mot. Summ. J., Ex. 26 (emphasis in original).)  Although Pasour sent out the letter, he was not the ultimate decision maker in Plaintiff's termination.  (Pasour Dep. 75:8–11.)  Rather, Pasour explained that Carolyn Carter made the final determination.  (Id. at 75:13–18; Pasour Mot. Summ. J., Ex. 8, Resp. to Interrogatory No. 6.)  Pasour further testified that had Plaintiff returned to work, he "probably" would not have been terminated.  (Pasour Dep. 58:5–12.)  Finally, Pasour indicated that although Plaintiff was terminated before the expiration of his allotted nine months, the MLOA Policy permitted limitation of leave in cases of severe personnel

14

shortages and there was a personnel shortage in Plaintiff's position of Asset Manger.  (Id. at 73:7–76:24.)

### F.      Plaintiff's Receipt of Social Security Benefits

On December 10, 2009, while still out of work on medical leave, Plaintiff filed for Social Security Disability benefits.  (Def. Pasour's Mot. Summ. J., Ex. 27.)  A representative from the Social Security Administration contacted Plaintiff on March 1, 2010, and Plaintiff stated that he stopped working because of his diabetes and his amputation, that he had had eye surgery in December, and that he was currently on his dialysis three times per week.  (Def. Pasour's Mot. Summ. J., Ex. 29.)  Plaintiff has been receiving benefits from 2010 through at least March 18, 2013.  (Id., at Ex. 30.)  Plaintiff testified that he made multiple unsuccessful efforts to obtain employment since his termination.  (Freeman Dep. 89:22–91:10.)

### G.      Subsequent Medical Letters

Following Plaintiff's termination, two of his physicians sent in notes to PHA regarding his medical status.  On May 21, 2010, Alan Meltzer, M.D. noted that Plaintiff could return to a desk job on June 4, 2010.  (Def. Pasour Mot. Summ. J., Ex. 25.)  On May 26, 2010, Dr. Martin also opined that Plaintiff could return to a "sedentary (desk) position" on June 4, 2010.  (Id.)

### H.      Procedural History

On May 3, 2011, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging disability discrimination.  (Second Am. Compl. ¶ 48.)  This charge was jointly filed with the Pennsylvania Human Relations Commission alleging disability based on employment discrimination and retaliation.  (Id.)  The EEOC issued a right-to-sue letter on March 16, 2012.  (Id. ¶ 49.)

15

On March 21, 2012, Plaintiff initiated the current federal litigation alleging, *inter alia*, claims under the Americans With Disabilities Act and the FMLA.  The Defendants filed Motions to Dismiss resulting in an Amended Complaint on August 20, 2012 and a Second Amended Complaint on August 22, 2012.  This latest iteration sets forth the following counts: (1) violation of the Family Medical Leave Act against Defendant City of Philadelphia and (2) interference under the Family Medical Leave Act against Defendants Thomas and Pasour.

Plaintiff filed a Motion for Summary Judgment on May 15, 2013.  Defendants PHA and Thomas jointly filed their own Motion for Summary Judgment on May 22, 2013, and Defendant Pasour filed his separate Motion for Summary Judgment on May 22, 2013.  Following the submission of various response and reply briefs, all briefing was completed on these Motions by June 17, 2013, making them ripe for judicial review.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.

16

Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA

Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court

must consider the evidence, and all reasonable inferences which may be drawn from it, in the

light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg

Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the

evidence presented by both sides, the court must accept as true the allegations of the non-moving

party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact,

it need not "support its motion with affidavits or other similar materials negating the opponent's

claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing

out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at

325.  Once the movant has carried its initial burden, the opposing party "must do more than

simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec., 475

U.S. at 586.  "[T]he non-moving party must rebut the motion with facts in the record and cannot

rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley

Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).  If the non-moving party "fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex,

477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant

will not be adequate to support a denial of a motion for summary judgment; there must be

enough evidence to enable a jury to reasonably find for the non-movant on that issue.  Anderson,

17

477 U.S. at 249–50.

Notably, these summary judgment rules do not apply any differently where there are cross-motions pending.  Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008).  As stated by the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'"  Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.    DISCUSSION

As indicated above, Plaintiff moves for summary judgment in his favor on all claims against all Defendants.  In turn, Defendant Pasour and, separately, Defendants PHA and Thomas respond to this Motion and likewise move for summary judgment in their favor on all claims against them.  The Court addresses the various claims individually.

### A.    Claims Against Defendant Fred Pasour[6]

Plaintiff's sole claim against Defendant Pasour alleges interference with the FMLA.  Defendant Pasour now argues that he is entitled to summary judgment on the FMLA interference claim against him on four grounds.  First, he contends that he neither had supervisory control over Plaintiff nor exercised sufficient control over Plaintiff's leave to have individual liability imposed upon him.  Second, he asserts that Plaintiff has not established a willful violation by

---

[6] Because Pasour is separately represented and has brought an individual Motion for Summary Judgment raising unique arguments, the Court considers his Motion and Plaintiff's Cross-Motion with respect to him independently of the claims against PHA and Defendant Thomas.

Pasour, making his claims barred by the two year statute of limitations.  Third, he contends that there was no interference with Plaintiff's FMLA rights.  Finally, he asserts that the doctrine of judicial estoppel bars the claims against Pasour because he represented to the Social Security Administration that he is unable to work.  Because the Court finds merit to Defendant Pasour's first and second arguments, the Court will grant summary judgment on those argument without consideration of his other assertions.

### 1.    Whether Pasour Was an Employer

The FMLA prohibits "employer[s]" from "interfer[ing] with, restrain[ing], or deny [ing] the exercise or the attempt to exercise, any right provided under [the Act]."  29 U.S.C. § 2615(a)(1); see also Olschefski v. Red Lion Area Sch. Dist., No. Civ.A.12-871, 2012 WL 6003620, at *11 (M.D. Pa. Nov. 30, 2012). The FMLA defines an "employer" as, *inter alia*, "any person who acts, directly or indirectly, in the interest of an employer."  29 U.S.C. § 2611(4)(A)(ii)(I).  The United States Court of Appeals for the Third Circuit has observed that "[s]ection 2611(4)(A)(ii)(I)'s inclusion of 'any person who acts, directly or indirectly, in the interest of an employer' plainly contemplates that liability for FMLA violations may be imposed upon an individual person who would not otherwise be regarded as the plaintiff's 'employer.'" Haybarger v. Lawrence Cnty. Adult Probation & Parole, 667 F.3d 408, 413 (3d Cir. 2012) (quoting 29 U.S.C. § 2611(4)(A)(ii)(I)).  In Haybarger, the Third Circuit joined the ranks of other circuits finding that individual liability is available under the FMLA.  Id. at 414.  Relying on the definition of "employer" under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et. seq., the Third Circuit held that "an individual is subject to FMLA liability when he or she exercises 'supervisory authority over the complaining employee and was responsible in whole or part for

the alleged violation' while acting in the employer's interest." Id. at 417 (quoting Riordan v. Kempiners, 831 F.2d 690, 694 (7th Cir. 1987)).  In analyzing an individual supervisor's control over the employee under the FLSA and the FMLA, the Third Circuit then remarked that "most courts look to the 'economic reality' of the employment situation, examining whether the individual supervisor carried out the functions of an employer with respect to the employee." Id. (citing cases).  In other words, "whether a person functions as an employer depends on the totality of the circumstances rather than on 'technical concepts of the employment relationship.'" Id. at 418 (quotation omitted).  To that end, the Third Circuit found several factors to be relevant in ascertaining the economic reality of the employment situation, including whether the individual "'(1) had the power to hire and fire the employee[], (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" Id. at 418 (quoting Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999)) (further quotations omitted).

In the present case, Plaintiff's sole argument in his Summary Judgment Motion[7] regarding Pasour's status as an "employer" is as follows:

> In 2005, Pasour became the Director of Labor and Employment (Pasour Dep. at 12).  He supervised a staff of four (4) employees. *Id.*  In 2008, he was promoted to Acting General Counsel for Labor and Employment. (Pasour Dep. at 13).  He was in charge of the Labor and Employment Department.  (Pasour Dep. at 15).  Mr. Pasour was the employee who was responsible for approving or disapproving FMLA and MLOA leave. (Pasour Dep. at 19–20).  Moreover, Pasour was the employee who terminated the Plaintiff in this action from employment and he acted directly on Plaintiff when he fired him; and that the reasons Pasour gave for Plaintiff's termination demonstrate that he at least purported to have been acting in PHA's

---

[7]  Plaintiff's Brief in Support of his Motion for Summary Judgment is his sole submission in the present summary judgment proceedings, functioning both as a motion and as a response to the Cross-motions.

interest when he did so.

> As supervisors, both Defendants [Pasour and Thomas] acted directly and indirectly in furthering the interest of PHA with respect to the FMLA policy and are therefore subject to liability.  Pasour and Thomas exercised control over Plaintiff's leave of absence, his pay, as well as shared responsibility for labor and employee relations; salary and wage administration; work scheduling, benefits administration; records management; human resources information system, hiring and firing of PHA employees and the ADA 504; FMLA and other regulatory compliance programs. (Am. Com[p]l. ¶ 11).

(Pl.'s Mem. Supp. Mot. Summ. J. 48.)

Plaintiff's bald assertions, however, stand unsupported by the evidence of record. According to Plaintiff's own account, Pasour did not supervise Plaintiff at all, did not control any aspects of his employment, did not give him any of his job assignments, did not have any involvement in his scheduling or vacation time, and did not determine his pay rate.  (Freeman Dep. 46:18–47:8.)  Indeed, Plaintiff only know him as a human resources guy—he had never met him and did not know his responsibilities, including whether or not he had any involvement with enforcing the FMLA.  (Id. at 44:9–45:16.)  Plaintiff conceded that he had never really dealt with Pasour and that Pasour was not his supervisor.  (Id. at 80:10–81:21.)  He testified that he had no knowledge regarding what, if any, role Pasour had with respect to enforcing the FMLA policy at PHA.  (Id. at 81:22–82:2.)  As tellingly put by Plaintiff, "I just–I just know him as Fred working in HR; that's all I know."  (Id. at 44:22–23.)

When Plaintiff first went out on leave, he had no discussions with Defendant Pasour and did not speak with him regarding his approval for FMLA.  (Id. at 2:8–20, 31:18–22, 42:4–13.).)  Indeed, Plaintiff's first discussion with Pasour was not until November 2009.  (Id. at 46:2–12, 48:20–23.)  At that point, he had a total of two alleged conversations with him.  (Id. at

21

52:17–53:1.)  The first was when Pasour allegedly asked him if he could walk and Plaintiff

replied that he could—there was no discussion regarding his FMLA absence.  (Id. at

48:20–49:16.)  The second conversation occurred in January 2010, when Pasour contacted

Plaintiff to ask how he was doing.  (Id. at 49:19–22.)  At that time, Pasour purportedly made a

statement that, "Well, you know Mr. Greene don't like people like you hanging around."  (Id. at

49:23–50:7.)  Plaintiff admittedly did not understand the meaning of this statement.  (Id. at

50:8–10.)  He never otherwise dealt with Mr. Pasour.  (Id. at 63:8–9.)

　　　As to the decisions regarding Plaintiff's return to work and his ultimate termination, the

evidence suggests that Pasour was nothing more than an intermediary.  Sometime in early

February 2010, Defendant Pasour had a conversation with his supervisor, Carolyn Carter,

regarding Plaintiff's status.  (Pasour Dep. 51:4–18.)  Carter directed Pasour to find out why

Plaintiff could not return to work and if he could not return to work, to terminate him.  (Id. at

51:15–16, 55:12–14, 61:19–23, 64:9–17.)  Carrying out these instructions, Pasour sent Plaintiff

the February 4, 2010 return to work letter.  (Pasour Mot. Summ. J., Ex. 23; Pasour Dep.

56:10–58:16.)  Although Defendant Thomas subsequently told Plaintiff that she needed to speak

to Pasour regarding scheduling Plaintiff's physical, Plaintiff himself never spoke with Pasour

regarding the physical.  (Freeman Dep. 199:11–201:2.)  Ultimately, although Pasour sent out

Plaintiff's February 17, 2010 termination letter, he was not the ultimate decisionmaker—that

decision rested with Carolyn Carter.  (Pasour Dep. 75:8–18; Pasour Aff. ¶ 4.)

　　　In the face of this evidence, Plaintiff freely admitted at his deposition that he possessed

no evidence that Pasour was, in any way, his employer or was otherwise involved in decisions

regarding his leave.  Plaintiff did not know who was responsible for enforcing PHA's FMLA

policy or who approved him for FMLA leave.  (Freeman Dep. 42:11–24.)  He stated that he had

no facts that Pasour had any involvement with enforcing the FMLA.  (Id. at 45:4–17.)  Further,

he conceded that he had no facts to suggest that Pasour was the one who decided that Plaintiff

needed to return to work on February 8, 2010.  (Id. at 57:20–24.)  In addition, he admitted that he

had no facts that would indicate that Pasour had any responsibility in scheduling Plaintiff's

appointment with PHA's physician for his return to work.  (Id. at 62:3–53:22.)  Finally, Plaintiff

had no facts that Pasour was the individual who decided that Plaintiff should be terminated.  (Id.

at 70:13–22.)  Indeed, the only Pasour involvement of which Plaintiff was aware—aside from the

return to work and termination letters having Pasour's signature—was that Thomas stated that

she needed to speak with Pasour about his return to work.  (Id. at 101:12–16.)  Nonetheless,

Plaintiff offered no proof that Pasour was responsible for processing his return to work.  (Id. at

104:7–106:2.)

        Nothing in the factual record before the Court would permit any reasonable factfinder to

determine that Defendant Pasour is an employer for purposes of the FMLA.  According to both

Pasour's and Plaintiff's express deposition testimony, Pasour had no authority over Plaintiff's

employment including hiring and firing, controlling of wages and work conditions, or making

decisions regarding FMLA liability.  Pasour unequivocally stated that he had no decisionmaking

authority with respect to the administration, approval, or disapproval of Plaintiff's FMLA leave,

the scheduling of Plaintiff's return-to-work physical, or the decision to terminate Plaintiff from

PHA employment.  In turn, Plaintiff concedes that he has no facts with which to rebut this

testimony.  In short, no genuine issue exists as to the fact that Pasour was not Plaintiff's

"employer" for purposes of individual FMLA liability.  As such, the Court must grant summary

23

judgment in favor of Pasour and against Plaintiff on this claim.

### 2.    Whether the Interference Claim Against Pasour is Time-Barred

Alternatively, even if this Court were to find that Plaintiff has created an issue of fact as to Pasour's status as an "employer" under the FMLA, the Court would be constrained to find that the claim against Pasour is time-barred.  The statute of limitations for a violation of the FMLA is two years after "the date of the last event constituting the alleged violation for which the action is brought."  29 U.S.C. § 2617(c)(1).  In the case of a willful violation of the FMLA, however, a plaintiff has three years in which to institute an action.  Id. § 2617(c)(2).

The FMLA does not define "willful," and neither the Supreme Court nor the Third Circuit has expressly defined it in the context of the FMLA.  Rigel v. Wilks, No. Civ.A.03-971, 2006 WL 3831384, at *13 (M.D. Pa. Dec. 28, 2006).  Both courts, however, have addressed "willfulness" in the context of the Fair Labor Standards Act ("FLSA")—an act deemed analogous in many respects to the FMLA.  Id. (citing Brock v. Richland Shoe Co., 799 F.2d 80 (3d Cir. 1986), aff'd sub nom. McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988)).  Thus, a plaintiff attempting to establish a willful violation of the FMLA must do more than show that his "employer knew [the FMLA] was in the picture," because such a low standard would "obliterate[] any distinction between willful and nonwillful violations."  McLaughlin, 486 U.S. at 130, 132–33.  The Supreme Court went on to reject a willfulness standard that require mere negligence or on a "good-faith but incorrect assumption" that the employer was complying with the law in all respects.  Id. at 135.  Instead, it defined "willful" as requiring a showing that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute."  Id. at 133; see also Caucci v. Prison Health Servs., Inc., 153 F. Supp. 2d

605, 609 (E.D. Pa. 2001).  Willfulness is "found most frequently in situations in which the

employer deliberately chose to avoid researching the law's terms or affirmatively evaded them."

Hoffman v. Prof'l Med. Team, 394 F.3d 414, 419 (6th Cir. 2005); see also Sommer v. Vanguard

Grp., 380 F. Supp. 2d 680, 686 (E.D. Pa. 2005).

       Plaintiff, in this case, was terminated on February 19, 2010 and, as such, was required by

law to assert his FMLA claims on or before February 19, 2012.  Because Plaintiff did not file his

Complaint until March 21, 2012—over a month past the expiration of the statute of

limitations—he is required to prove willfulness to earn the benefit of the extended three year

limitations period.  Plaintiff, however, fails to even allege a willful violation by Pasour in the

Second Amended Complaint, let alone establish it for purposes of summary judgment.  Given

Plaintiff's limited knowledge as to the role Pasour played in the granting and administration of

FMLA leave and in Plaintiff's ultimate termination, Plaintiff has been completely unable to come

forward with any evidence intimating in any way that Pasour knew or showed reckless disregard

for whether his conduct with respect to Plaintiff's leave was prohibited by statute.  Plaintiff had

no discussions with Pasour prior to or during the majority of his FMLA or extended MLOA

leave, and Plaintiff's account of the two conversations he had with Pasour in November 2009 and

January 2010 reveals that there was no discussion of any leave-related issues.  Moreover,

Plaintiff has produced no evidence that Pasour hindered Plaintiff's efforts to set up a physical or

otherwise return to work.  Indeed, by all accounts, Pasour's actions were dictated entirely by

Carolyn Carter.

       Even more tellingly, while Defendant Pasour raises this absence of evidence as grounds

for his Summary Judgment Motion, Plaintiff has not even acknowledged this argument, let along

come forward with evidence to rebut it.  As set forth above, once a moving party has carried its initial burden by pointing out an absence of evidence to support the plaintiff's claims, the plaintiff "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586.  "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Grp., 455 F.3d at 201.  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.

As no reasonable factfinder could determine that Pasour willfully violated the FMLA,[8] Plaintiff's claim against Pasour is time barred since it was filed after the expiration of the two-year limitations period.  Because Plaintiff has failed to make any showing of willfulness, he is not entitled to the benefit of the extended three-year statute of limitations under the FMLA. Accordingly, the FMLA interference claim against Defendant Pasour must be dismissed.

### 3.   Conclusion as to Defendant Pasour

In light of the foregoing, the Court must grant Defendant Fred Pasour's Motion for Summary Judgment in its entirety and deny Plaintiff's Motion for Summary Judgment as to Fred Pasour in its entirety.  Plaintiff has produced no evidence remotely suggesting that Pasour is an "employer" for purposes of being subject to FMLA liability.  Moreover, even if Pasour could be

---

[8] In discussing willfulness, the Court assumes—without deciding in any way—that Plaintiff could prove that Pasour violated the FMLA by interfering with his FMLA rights.  Given the ensuing discussion regarding the interference claim against Defendant PHA, however, the Court retains significant reservations to whether Plaintiff could survive that initial hurdle.

deemed an "employer," Plaintiff has failed to provide any evidence that Pasour willfully interfered with Plaintiff's FMLA rights, thus causing his claim to be time-barred.  Accordingly, with respect to Count II of Plaintiff's Second Amended Complaint, the Court enters judgment in favor Defendant Pasour and in favor of Plaintiff.

### B. Claims Against Defendant PHA

Defendant PHA likewise moves for summary judgment as to all claims against it. Specifically, it contends that Plaintiff cannot establish the requisite elements of either a claim for interference under the FMLA or a claim for retaliation under the FMLA.  Plaintiff, in turn, moves for summary judgment in his favor on both claims.  The Court jointly considers the cross-motions as to each claim.

### 1. FMLA Interference Claim[9]

To state a claim for FMLA interference, a plaintiff must allege that: (1) he was an eligible employee under the FMLA; (2) the defendant-employer was subject to the requirements of the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave notice to the defendant of his intention to take FMLA leave; and (5) he was denied the benefits to which he was entitled under the FMLA.  Figueroa v. Merritt Hospitality, LLC, No. Civ.A.11-1807, 2011 WL 4389585, at *3 (E.D. Pa. Sept. 21, 2011) (citations omitted).  Under the fourth element, employees wishing to take qualified leave must provide adequate notice to their employers.  Grosso v. UPMC, ___ F. Supp. 2d ___, No. Civ.A.10-0075, 2012 WL 787481, at *19 (W.D. Pa. Mar. 9, 2012).  "An employee need not specifically mention the FMLA or assert rights under it to satisfy the notice

---

[9]  Although the FMLA claims against PHA could also potentially be time-barred if Plaintiff could not prove willfulness, PHA did not raise this as an argument.  Accordingly, the Court will not *sua sponte* consider it.

requirement." Farver v. Coventry Health Care, Inc., No. Civ.A.10-1927, 2012 WL 1191849, at

*6 (M.D. Pa. Mar. 2, 2012) (citing 29 C.F.R. § 825.302(c)) (additional citations omitted).  "The

employee need only state that leave is needed."  Id.  The fifth element may be presumed by a

termination of the employee that forecloses an entitlement to benefits such as FMLA leave.  Id. at

*7.  As the Third Circuit has explained, "[a]n interference action is not about discrimination, it is

only about whether the employer provided the employee with the entitlements guaranteed by the

FMLA."  Callison, 430 F.3d 117, 120 (3d Cir. 2005).  An employer interferes with the exercise

of FMLA rights by refusing to authorize FMLA leave or denying other benefits or by

"discouraging an employee from using such leave."  29 C.F.R. § 825.220(b).  "An employer

discourages an employee from taking FMLA leave by pressuring the employee to take leave at

another time, . . . by proposing the employee work from home instead of taking FMLA leave, . . .

or by criticizing an employee for taking too much FMLA leave."  Hillborn v. Codaro, No.

Civ.A.06-223, 2007 WL 2903453, at *7 (M.D. Pa. Sept. 28, 2007) (internal citations omitted).

        The parties appear to agree that the first four elements have been satisfied, as Plaintiff

was an eligible employee under the FMLA, PHA was an employer subject to the FMLA's

requirements, Plaintiff was entitled to FMLA leave, and Plaintiff gave notice of his intention to

take FMLA leave.  The question now arises whether, under the fifth element, Plaintiff was

denied the benefits to which he was entitled under the FMLA.

        Plaintiff contends that Defendant PHA unequivocally interfered with his FMLA rights in

multiple respects.  First, Plaintiff contends PHA violated their notification obligations through

the following actions: (a) Thomas's statement in mid-June 2009 that he would use his "sick time

and . . . vacation time first," of which he had approximately six months  (Freeman Dep. 147:5–6,

28:4–17, 189:2–6) and that he had up to a year to come back to work,  (Freeman Dep.

28:23–29:2, 188:18–189:1); (b) failure to ensure that Plaintiff was receiving his mail; and (c)

failure to notify Plaintiff that it was designating Plaintiff's paid leave time as FMLA leave.

Second, Plaintiff argues that PHA never properly informed him when he was on MLOA leave,

failed to clearly approve him for MLOA leave, and misapplied the MLOA Policy by terminating

him in February.  Third, Plaintiff claims that PHA stalled with respect to Plaintiff's numerous

request to return to work with an accommodation of a desk job until after the FMLA leave

expired.  The Court addresses each of Plaintiff's contentions individually

a.    <strong><u>Failure to Notify</u></strong>

First, as to Plaintiff's failure to notify allegations, the regulations make clear that

"[f]ailure to follow the notice requirements set forth in this section may constitute an interference

with, restraint, or denial of the exercise of an employee's FMLA rights."  29 CFR § 825.300(e).

These requirements mandate that when an employee requests FMLA leave or acquires

knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must

notify the employee of the employee's eligibility to take FMLA leave within five business days,

absent extenuating circumstances.  Id. § 825.300(b)(1).  The notification of eligibility may be

orally or in writing.  Id. § 825.300(b)(2).  In addition, employers are obligated to provide a

"Rights and Responsibilities" notice, which requires written notice detailing the specific

expectations and obligations of the employee and explaining any consequences of a failure to

meet these obligations."  Id. § 825.300(c)(1).  If leave has already begun, the notice should be

mailed to the employee's address of record and the specific notice must include, as appropriate:

(1) that the leave may be designated and counted against the employee's annual FMLA leave

29

entitlement if qualifying; (2) any requirements for the employee to furnish certification of a serious health condition, serious injury or illness, or qualifying exigency arising out of covered active duty or call to covered active duty status, and the consequences of failing to do so; (3) the employee's right to substitute paid leave, whether the employer will require the substitution of paid leave, the conditions related to any substitution, and the employee's entitlement to take unpaid FMLA leave if the employee does not meet the conditions for paid leave; (4) any requirement for the employee to make any premium payments to maintain health benefits and the arrangements for making such payments and the possible consequences of failure to make such payments on a timely basis; (5) the employee's status as a key employee and the potential consequence that restoration may be denied following FMLA leave; (6) the employee's rights to maintenance of benefits during the FMLA leave and restoration to the same or an equivalent job upon return from FMLA leave; and (7) the employee's potential liability for payment of health insurance premiums paid by the employer during the employee's unpaid FMLA leave if the employee fails to return to work after taking FMLA leave.  Id. § 825.300(c)(1).  Finally, employers must provide a "Designation Notice."  In other words, "[w]hen the employer has enough information to determine whether the leave is being taken for a FMLA–qualifying reason (e.g., after receiving a certification), the employer must notify the employee whether the leave will be designated and will be counted as FMLA leave within five business days absent extenuating circumstances."  Id. § 825.300(d).  "If the employer requires paid leave to be substituted for unpaid FMLA leave, or that paid leave taken under an existing leave plan be counted as FMLA leave, the employer must inform the employee of this designation at the time of designating the FMLA leave."  Id. § 825.300(d)(1).  Further "[i]f the employer will require the

30

employee to present a fitness-for-duty certification to be restored to employment, the employer must provide notice of such requirement with the designation notice." Id. § 825.300(d)(3).  The designation notice must be in writing.  Id. § 825.300(d)(4).

In the present case, PHA fully complied with its notification obligations.  Plaintiff first spoke with Defendant Thomas on June 7 or 8, 2009 about his recent and impending surgeries. (Freeman Dep. 24:13–25:4; Thomas Dep. 89:7–23.)  On June 8, 2009—well within the mandatory five day period—Thomas sent him a letter stating as follows:

> The Philadelphia Housing Authority ("PHA") has been notified that you require a leave of absence.
>
> This is to inform you that under the Family and Medical leave Act of 1993, and PHA's FMLA Policy, you are entitled to up to 12 weeks of unpaid leave in a rolling year for qualified family leave, personal medical leave or medical leave for family care.  Based upon the information you have provided to us, you or your immediate family member's condition may constitute a serious health condition and that you may, therefore, be eligible for leave under our FMLA policy. Because we have not been able to confirm whether any of the time you have taken qualifies under the FMLA policy, we are preliminarily designating any future time off as FMLA qualifying and are requesting that you provide a completed medical certification form regarding your leave.  In this regard, we have enclosed a medical certification form, which must be completed by your treating physician. . . . We have also enclosed a copy of PHA's FMLA policy.
>
> You must return the fully completed medical certification form to me within fifteen (15) days of the day of this letter.  Failure to do so may result in any or all of our leave not qualifying as FMLA leave and may expose you to discipline or discharge for your absences in accordance with our attendance policy.  Upon PHA's timely receipt of a medical certification which confirms that your leave is FMLA qualifying, this preliminary designation of qualified FMLA leave will become final.

(Def. Pasour's Mot. Summ. J., Ex. 13.)  As noted, the letter included both a medical certification form, as well as two page notice of "Employee Rights, Obligations and Responsibilities that clearly informed Plaintiff, in full compliance with § 825.300(c)(1), that (1) the leave requested

would be designated and counted against the employee's annual FMLA leave entitlement if qualifying; (2) Plaintiff was required to provide a medical certification; (3) Plaintiff "must" substitute accrued paid leave for unpaid FMLA leave and must exhaust accrued paid leave prior to using unpaid leave; (4) PHA would continue to make premium payments to maintain Plaintiff's health care coverage; (5) Plaintiff had a right to maintenance of benefits during the FMLA leave and restoration to the same or an equivalent job upon return from FMLA leave; and (6) Plaintiff had potential liability for payment of health insurance premiums paid by the PHA during the FMLA leave if Plaintiff failed to return to work after taking FMLA leave.  (Id.) Moreover, the Notice indicated that if Plaintiff became disabled and wished to explore a reasonable accommodation which would allow him to perform the essential elements of his job, he could make a written request in advance of the expiration of his leave to allow for "adequate, mutual exploration of relevant options."  (Id.)  Plaintiff admitted to receiving and completing the relevant papers, and returning them to PHA.  (Freeman Dep. 26:15–18.)  In addition, Plaintiff's physician provided the required Medical Certification.  (Def. Pasour's Mot. Summ. J., Ex. 15.)

Upon receipt of these papers, Thomas and Plaintiff had a conversation where, according to Plaintiff, Thomas made the oral statement that he had "up to a year to come back to work." (Freeman Dep. 28:23–7.)  On June 26, 2009, however, Thomas sent Plaintiff a letter explicitly stating as follows:

> This is to inform you that under the Family and Medical Leave Act of 1993, and PHA's FMLA Policy, you have a right to up to twelve (12) weeks of unpaid leave in a rolling year for an FMLA qualifying event.  Based upon the information you have provided to us in the past, we have determined that our condition/our immediate family member's condition constitutes an FMLA qualifying event.  **Accordingly, you request for a leave of absence is approved and the requested leave will be counted against your FMLA leave entitlement.**

**Start Date:**   **06/08/09**
**End Date:**     **08/31/09**

As explained above, the FMLA provides for up to twelve (12) weeks of unpaid leave in a rolling year.  PHA complies with the FMLA by providing twelve weeks of unpaid leave in each rolling year.  You will be allowed to return to your position, or a substantially equivalent job at any time during, or upon expiration of your twelve week leave period.  In addition, your health insurance benefits will be maintained during your FMLA leave under the same conditions as if you continued to work.  If you do not return to work following FMLA leave for reasons other than (1) the continuation, recurrence or onset of a serious health condition; or (2) other circumstances beyond your control, you may be required to reimburse PHA for our share of health insurance premiums paid on our behalf during FMLA leave.

PHA requires that all employees on FMLA leave use any accrued leave available under the circumstances concurrently with the unpaid FMLA leave.  Accordingly, you will be required to use sick/vacation time, which you have accrued concurrently with your unpaid FMLA leave.

(Def. Pasour's Mot. Summ. J., Ex. 17 (emphasis in original).)  In addition, PHA sent Plaintiff a Request/Designation of FMLA Form indicating that Plaintiff was eligible for twelve weeks of FMLA leave, which would be counted against his annual leave entitlement.  (Def. Pasour's Mot. Summ. J., Ex. 18.)  In addition, he was notified that he was not a key employee and that he would be required to present a fitness-for-duty certificate prior to returning to employment.  (Id.) Plaintiff expressly conceded that he received this letter sometime in or prior to August 2009.

(Freeman Dep. 35:17–39:17.)

In light of this evidence, Plaintiff's interference arguments are meritless.  First, accepting as true Plaintiff's allegation that Thomas told him that he had "up to one year" to return to work, this statement in no way misinformed or mislead him about his FMLA leave.  The FMLA, by its express terms only allows for up to twelve weeks of leave.  Further, this statement was made prior to any final FMLA designation being made.  PHA subsequently fully complied with its

33

obligations to provide Plaintiff with a Designation Notice informing him that he was being given twelve weeks of FMLA leave running from June 8, 2009 to August 31, 2009.  At no point did PHA ever state, in conjunction with or after that notice, that Plaintiff was entitled to a full year of FMLA leave.

Second, to the extent Plaintiff claims he was not getting his mail from his sister and thus never received notice, this argument falters in several respects.  Primarily, Plaintiff conceded that he was getting his mail while in the hospital and explicitly admits that he received the Designation Notice.  (Freeman Dep. 34:7–18, 39:10–12.)  Moreover, even assuming he somehow did not get his mail, the Designation Notice was sent to Plaintiff's address of record and was signed for by his sister.  To the extent Plaintiff's sister failed to transfer the mail to Plaintiff, that failure cannot be imputed to the PHA as somehow not complying with its obligations.  This is particularly true given that Plaintiff admits that his home address was the address on record with the PHA, that he never told Thomas to send anything to him at the hospital, and that he never advised anyone at PHA that any mail should be sent to him anywhere but his house.  (Id. at 34:1–35:13.)  Finally, the fact that Plaintiff received his mail while in the hospital was evidenced by the fact that he completed and returned the Medical Certification form sent with the June 8, 2009 letter from Thomas.[10]

---

[10]  Plaintiff argues in his Motion for Summary Judgment that Thomas was aware that Plaintiff was not receiving his mail.  Plaintiff's characterization of Thomas's testimony, however, is inaccurate.  Thomas testified—and her handwritten notes suggest—that on September 28, 2009, Plaintiff called her to tell her he had been in the hospital and was not getting his mail. (Thomas Dep. 156:6–14.)  That knowledge—acquired well after both the Designation Notice and the first Return to Work Notice—would have had no bearing on where she would have sent those Notices.  Moreover, Thomas explained that after that conversation, she did not send any mail to him.  (Id. at 156:15–25.)

Third, Plaintiff's general complaint that he was never properly notified that PHA designated his paid leave as FMLA is flatly contradicted by the evidence.  The Designation Notice expressly states that "PHA requires that all employees on FMLA leave use any accrued leave available under the circumstances concurrently with the unpaid FMLA leave.  Accordingly, you will be required to use sick/vacation time, which you have accrued concurrently with your unpaid FMLA leave."  (Def. Pasour's Mot. Summ. J., Ex. 17.)  As noted above, the FMLA specifically provides that an employer is entitled to require that sick and vacation time be used concurrently with FMLA time.[11]  Accordingly, the Court finds no violation in that regard.

###### b.      Failure to Advise Plaintiff of His MLOA Status and Improper Application of the MLOA Policy

Plaintiff's next basis for his FMLA interference claim is that PHA "violated the regulations by failing to inform Plaintiff that he was approved from MLOA leave."  (Pl.'s Mem. Supp. Mot. Summ. J., 26.)  As noted by Plaintiff, the MLOA policy states that PHA would approve or disapprove the request for leave of absence and will notify the supervisor and

---

[11]   Plaintiff's effort to liken this case to two other cases from within the Third Circuit is misplaced.  First, in Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135 (3d Cir. 2004), the Third Circuit remarked that had the plaintiff been notified of his right to twelve weeks of FMLA leave after he gave notice to his employer of his serious health condition, he could have been able to make an informed decision about structuring his leave to preserve the job protection afforded by the Act.  Id. at 142–43.  In that case, however, the parties stipulated, for purposes of summary judgment, that the employer did not advise the plaintiff of his rights under the FMLA. Id. at 143.  In this case, the undisputed evidence reveals that PHA clearly advised Plaintiff of his rights under the FMLA.

Plaintiff also cites Nusbaum v. C.B. Richard Ellis, Inc., 171 F. Supp. 2d 377 (D.N.J. 2001).  In that case, the employer failed to designate the plaintiff's leave as FMLA leave until after the plaintiff was terminated and the court held that that failure constituted FMLA interference.  Id. at 386. In the present case, however, no issue of material fact remains that Plaintiff was expressly told that he was entitled to twelve weeks of FMLA leave and that his FMLA leave was to run from June 8, 2009 to August 31, 2009.

employee, including the duration of the leave of absence and instructions regarding employment status.  (Pl.'s Mot. Summ. J., Ex. 20.)  Further, under the Policy, MLOA leaves runs concurrent with FMLA leave and the notification requirements are the same as under the FMLA.  (Id.)  Nonetheless, according to Plaintiff, he was never made aware of the MLOA Policy, never notified whether he was approved for MLOA leave, never informed about the duration of any MLOA leave, and never told that any leave had expired.  Moreover, he contends that assuming he had been on MLOA leave, his termination, on February 17, 2010, was premature by one month.

Again, Plaintiff's argument is misplaced.  While, as noted by Plaintiff, the regulations require "employers to inform their workers about the relationship between the FMLA and leave granted under company plans," such regulations simply "make it the employer's responsibility to tell the employee that an absence will be considered FMLA leave."  Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 87 (2002).  Jurisprudence from within the Third Circuit "does not suggest that an employee who was actually provided proper notice under § 825.301 may recover under an interference theory simply because an employer does not explain how additional non-FMLA leave affects the employee's ability to return to a position after the twelve-week leave period expires."  Thurston v. Cherry Hill Triplex, ___ F. Supp. 2d ___, No. Civ.A.06-3862, 2008 WL 9374284, at *6 (D.N.J. Aug. 5, 2008).  Indeed, "courts within this Circuit and others have been reluctant to extend the ability of a Plaintiff to bring FMLA interference claims, or extending the FMLA's right to reinstatement beyond twelve weeks, when the employee takes leave beyond the twelve-week FMLA entitlement period and is subsequently terminated."  Id. at *6–7 (citing Devine v. Prudential Ins. Co. of America, No. Civ.A.03–3971, 2007 WL 1875530, at *28–31

(D.N.J. June 28, 2007) (finding that an employee who was terminated after staying out of work for more than twelve weeks pursuant to the employer's permission could not bring an FMLA interference claim because her twelve weeks of protected leave had expired, and the employer had no obligation to provide her with notice that she was no longer protected by the FMLA); Dogmanits v. Capital Blue Cross, 413 F. Supp. 2d 452, 462–63 (E.D. Pa. 2005) (holding that FMLA protections do not apply to non-FMLA leave and therefore employees who exhaust their FMLA leave are not entitled to job restoration, even if the extended leave was pursuant to employer permission); McGregor v. Autozone, 180 F.3d 1305, 1308 (11th Cir. 1999) (holding that the text of the FMLA did not suggest that twelve weeks could be extended and that when an employer provides more than twelve weeks of leave the employer should not be liable for interfering with FMLA rights)).  Thus, "employees who exhaust the twelve weeks of leave provided under the FMLA stand to lose their entitlement to job restoration even if their employers provide additional, non-FMLA, leave." Dogmanits, 413 F. Supp. 2d at 462.

In the present case, the undisputed facts indicate that Plaintiff was notified that he had twelve weeks of FMLA leave that ran until August 31, 2009.  Although not statutorily required to do so, PHA sent Plaintiff a Return to Work Letter, on September 11, 2009, stating that Plaintiff's FMLA leave expired on August 31, 2009 and that he had to return to work by Friday, September 18, 2009 in order to avoid losing his position.  (Def. Pasour's Mot. Summ. J., Ex. 19.) Notwithstanding Plaintiff's failure to comply with the date set forth in that letter, PHA opted to refrain from terminating Plaintiff by keeping him—albeit unofficially—under its Medical Leave of Absence Policy.  Over five months after Plaintiff's FMLA leave expired, PHA sent Plaintiff another Return to Work letter reiterating that his FMLA entitlement had expired and that he had

to return to work by February 8, 2010 or be deemed a voluntary quit.  (Pasour Mot. Summ. J.,

Ex. 23.)  Only after Plaintiff still did not return to work did PHA terminate Plaintiff effective

February 19, 2010.  (Pasour Mot. Summ. J., Ex. 26.)  Far from being denied his statutory benefit

under the FMLA, Plaintiff was given clear notice of his designation of FMLA leave, the duration

of that leave, and the expiration of that leave, as well as ample additional leave time under the

employer's policy.  In other words, Plaintiff was given the full benefit of his FMLA rights.  At

that juncture, Plaintiff had no federal statutory entitlement to notification about his MLOA status,

the duration of any allotted MLOA status, or correct calculation of his MLOA leave.  See

Frederick v. Brandywine Hosp., Inc., No. 03-3362, 2003 WL 21961372, *1 (E.D. Pa July 1,

2003) (noting that "[p]rotection under the FMLA is strictly limited to the 12 week period" and

holding that "while a company may grant a more generous leave policy in one manner or another,

any leave over the twelve-week figure can not be covered under the Act"); Panto v. Palmer

Dialysis Ctr./Total Renal Care, No. 01-6013, 2003 WL 1818990, *6 (E.D. Pa. April 7, 2003)

(holding that employer policies that surpass the requirements of the FMLA are not protected

under the FMLA).  Accordingly, the Court rejects this portion of Plaintiff's FMLA interference

theory.

> **c.**    **Stalling With Respect to Plaintiff's Requests for a Return to
> Work with an Accommodation**

In a final effort to establish interference, Plaintiff alleges that, beginning in 2008, he was

approved for and accommodated by Defendants with a desk job for his diabetic condition.

Specifically, he received a larger computer screen and was allowed to work at his desk rather

than performing inspections and collecting rent.  (Freeman Dep. 203:16–205:21, Thomas Dep.

38

86:6–87:17, Pasour Dep. 38:6–22.)  He continued to received this accommodation until he went

out on leave in June of 2008.  (Thomas Dep. 110:12–111:2.)  Thus, at the expiration of the

FMLA leave in August 2009, Plaintiff claims that he was capable of returning to work with the

desk job he was performing when he went out on leave.  Yet, according to Plaintiff, PHA never

considered accommodating Plaintiff with a desk job upon his return to work, (Thomas Dep.

113:11–15), despite the fact that the FMLA required reinstatement to his former position.  29

U.S.C. § 2614(a)(1).

       This argument is misplaced on several levels.  First, it is well established that "[t]he

FMLA does not require that the employer provide accommodation to an employee to facilitate

[his] return.  Rather, the employee must be able to perform the essential functions of the job

without accommodation."  Fogleman v. Greater Hazleton Health Alliance, 122 F. App'x 581,

587 (3d Cir. 2004), see also Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 384 (3d Cir. 2002)

(finding that the district court's jury instruction that "the FMLA does not require an employer to

provide a reasonable accommodation to an employee to facilitate his return to the same or

equivalent position at the conclusion of his medical leave, . . . was designed to clarify for the jury

the requirements of the FMLA and it did so accurately").

       Interpreting Plaintiff's argument to suggest that the accommodations were part of his

prior position to which he was entitled to be restored, Plaintiff's bald claim that Defendants did

not consider restoring him to that job is unsupported by any evidence. Nothing in the record

suggests that Plaintiff was required to return to anything other than his position as performed

prior to his leave.  Plaintiff concedes that he never had any discussions with either Pasour or

Thomas regarding additional accommodations needed due to his loss of toes, despite the fact that

his FMLA notice provided that if Plaintiff wished to explore accommodations, he needed to make a written request in advance of the expiration of his leave.  (Freeman Dep. 205:23–206:11; Pasour Mot. Summ. J., Ex. 13.)  Thomas explained that she did not consider an accommodation precisely because it was never an issue raised by Plaintiff.  (Thomas Dep. 113:11–22.)

Finally, and perhaps most importantly, Plaintiff provides no evidence establishing that the alleged failure to consider his prior accommodation hindered the full use and exercise of his FMLA rights.  Plaintiff was given the full twelve weeks of FMLA leave.  When he did not return to work upon the expiration of that leave on August 31, 2009, Thomas sent Plaintiff a letter indicating that he needed to return to work by September 18, 2009.  Notwithstanding Plaintiff's unsupported assertions that he was able to return to work as of that date (Freeman Dep. 158:9–158:12), Plaintiff simply did not return.  Tellingly, Plaintiff's own treating physician sent a letter to PHA, dated September 2, 2009, stating that Plaintiff "will be unable to work for 4 months because of complications."  (Def. Pasour's Mot. Summ. J., Ex. 20.)  Moreover, handwritten notes from Thomas, dated September 28, 2009, indicated that she had spoke with Plaintiff, who indicated that he had been in the hospital, was having problems with his heart, had lost his leg, and was in dialysis.  (Def. Pasour's Mot. Summ. J., Ex. 22.)

Accordingly, PHA's alleged refusal to consider returning Plaintiff to his former accommodated job—which included use of a larger computer monitor and substantial desk time—did not interfere with his FMLA rights.  As noted above, the FMLA does not require an employer to make accommodations in order to reinstate an employer after FMLA leave.  Moreover, Plaintiff produces no evidence that PHA would not have, at minimum, returned Plaintiff to his job exactly as he left it or, at most, considered some type of request

accommodation for his new disabilities.  Finally, Plaintiff makes no showing that any type of accommodation would have allowed him to be reinstated at work at the expiration of his FMLA. In short, Plaintiff creates no triable issue of fact upon which any reasonable factfinder could determine that the alleged "failure to accommodate" interfered with the full and complete use of his FMLA rights.

### d.    Conclusion as to FMLA Interference Claims Against Defendant PHA

In light of the foregoing discussion, the Court must find that PHA is entitled to summary judgment on Plaintiff's interference claim.  The evidence remains undisputed that PHA acknowledged Plaintiff's request for FMLA leave, provided him a preliminary designation of leave and notified him of his rights and obligations consistent with the Act.  "Under an interference claim, it is [P]laintiff's burden to demonstrate that []he was entitled to a benefit under the FMLA, but was denied that entitlement."  Bearley v. Friendly Ice Cream Corp., 322 F. Supp. 2d 563, 571 (M.D. Pa. 2004).  Nothing in any argument put forth by Plaintiff would allow a reasonably jury to conclude that PHA interfered with or caused Plaintiff to be deprived of his full entitlements and benefits under the FMLA.  As such, Defendant PHA's Motion for Summary Judgment on this claim is granted, Plaintiff's Motion for Summary Judgment on this claim is denied, and judgment on this claim is entered in favor of PHA and against Plaintiff.

### 2.    Retaliation Claim

An FMLA retaliation claim arises under 29 U.S.C. § 2615(a)(2), which makes it unlawful for an employer to discriminate against an employee who has taken FMLA leave.  29 U.S.C. § 2615(a)(2).  The FMLA's implementing regulations provide that "employers cannot use the

taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c); see also Hofferica v. St. Mary Med. Ctr., 817 F. Supp. 2d 569, 583–84 (E.D. Pa. 2011).  "Retaliation claims are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[12] Bearley, 322 F. Supp. 2d at 571.  To prevail on a claim of discrimination or retaliation based on FMLA leave, a plaintiff must show that: "(1) he took an FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse employment decision was causally related to his leave." Conoshenti, 364 F.3d at 146.  After establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action.  Bearley, 322 F. Supp. 2d at 571.  If the employer offers a legitimate, nondiscriminatory reason, the burden is shifted back to plaintiff to establish that the employer's reasons are pretextual.  Id.

A survey of the FMLA jurisprudence reveals that retaliation claims are alleged in the context of where an employee requested or took FMLA leave, remained at or returned to work, and then was subject to some type of adverse employment action such as termination or

---

[12]  Where an FMLA plaintiff has direct evidence of retaliation the standard set forth under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) applies.  Under the Price Waterhouse framework, "when an FMLA plaintiff alleging unlawful termination presents direct evidence that his FMLA leave was a substantial factor in the decision to fire him, the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have fired the plaintiff even if it had not considered the FMLA leave." Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 147 (3d Cir. 2004); see also Hofferica, 817 F. Supp. 2d at 584.  As our Court of Appeals has explained, to constitute direct evidence, "the evidence must be such that it demonstrates that the 'decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'" Walden v. Georgia–Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997) (quoting Price Waterhouse, 490 U.S. at 277).  Although Plaintiff makes reference to this standard, he offers no direct evidence of retaliation.

demotion.  See, e.g., Incorvati v. Best Buy Co., Inc., No. Civ.A.10-1939, 2013 WL 3283956, at *7 (D.N.J. June 27,  2013) (dealing with retaliation claim where three month lapsed between employee's return from FMLA leave and ultimate termination); Allen v. Nutrisystem, Inc., No. Civ.A.11-4107, 2013 WL 1776440, at *8 (E.D. Pa. Apr. 25, 2013) (declining to find retaliation where termination occurred over two months after last FMLA leave); Karaffa v. Montgomery Twp, No. Civ.A.12-1184, 2013 WL 1157626, at *7–8 (E.D. Pa. Mar. 21, 2013) (adverse actions suffered after employee returned from FMLA leave); Reinhart v. Mineral Techs. Inc., No. Civ.A.05–4203, 2006 WL 4050695, at *10–11 (E.D. Pa. Nov. 27, 2006) (finding that the decision to terminate an employee within twenty-four (24) hours after returning from his initial FMLA leave met "the bare minimum of sufficiency to establish causation"); Coppa v. Am. Soc'y for Testing Materials, No. Civ.A.04-234, 2005 WL 1124180, at *3 (E.D. Pa. May 11, 2005) (termination three months after return from FMLA leave).  The common thread running through all of these cases is that the plaintiff had actually returned to work from the FMLA leave and then suffered an adverse action in his or her employment.

The present case presents an entirely different animal.  This is not a scenario where Plaintiff took FMLA, returned to work, and then was terminated.  Rather, Plaintiff took over eight months of leave, and, despite two letters indicating he must return to work, he simply never did so.  Plaintiff cites to no cases where a retaliation claim has been maintained in such circumstances.  Nor can this Court fathom a situation where an employee can indefinitely remain on paid leave and then bring an FMLA discrimination claim if his employer attempts to terminate him despite giving the employee the full gamut FMLA benefits.  Indeed, the Third Circuit has stated that "[i]f the employee is not able to return to work after twelve weeks . . . the employer

may terminate the employee." Katekovich v. Team Rent A Car of Pittsburgh, Inc., 36 F. App'x 688, 690 (3d Cir. 2002). As such, because Plaintiff did not return to work after the expiration of his twelve weeks of FMLA leave—irrespective of whether or not he was physically able to do so—he cannot maintain an FMLA retaliation claim.

Moreover, even assuming *arguendo* that a retaliation claim could somehow fit into the present circumstances, Plaintiff has failed to meet his burden of establishing a prima facie case. Neither party disputes that Plaintiff invoked his FMLA leave, thereby satisfying the first element. Plaintiff, however, has neither proven nor created a genuine issue of material fact as to the second element—adverse employment action. This element may be satisfied by a showing that the plaintiff was terminated. "In order to show that termination was adverse, [p]laintiff needs to present evidence indicating that . . . [he] could have performed . . . [his] job duties at the time of . . . [his] termination." Dogmanits v. Capital Blue Cross, 413 F. Supp. 2d 452, 463 (E.D. Pa. 2005) (citing Alifano v. Merck & Co., Inc., 175 F. Supp. 2d 792, 795 (E.D. Pa. 2001)). "[A]n employee, who is terminated after the expiration of FMLA leave because the employee is unable to perform the essential functions of the job at the time of termination, has failed to establish the requirement of an adverse employment action for a FMLA retaliation claim." Gibson v. Lafayette Manor, Inc., No. Civ.A.05-1082, 2007 WL 951473, at *19 (W.D. Pa. Mar. 27, 2007).

Plaintiff, in this case, claims that when he was terminated, on February 17, 2010, he was fully capable of returning to work. Nowhere in Plaintiff's briefing, however, does he provide any support for this assertion. Such bald statements without any record support cannot create a genuine issue of material fact, particularly in the face of the contrary evidence of record. Nelson v. DeVry, Inc., No. Civ.A.07-4436, 2009 WL 1213640, at *2–3 n.6 & 7 (E.D. Pa. Apr. 23, 2009).

On September 2, 2009, three days after the expiration of Plaintiff's FMLA leave, his treating physician submitted a note to PHA stating that Plaintiff "will be unable to work for 4 months because of complications." (Def. Pasour's Mot. Summ. J., Ex. 20.)  Although Plaintiff, in deposition testimony, stated that he could go back to work because he "was able to walk," he admitted that he was still having other problems with his diabetes.  (Freeman Dep. 158:16–159:12.)  Moreover, Thomas's notes taken during a conversation with Freeman on September 28, 2009 revealed that Plaintiff was back in the hospital, having problems with this legs, and was in dialysis.  (Pl's Mot. Summ. J., Ex. 15.)  Thereafter, Plaintiff completed an application for Social Security Disability benefits on December 10, 2009, prior to his termination, in which he affirmatively indicated that he could not work because of his illnesses.  (Def. Pasour's Mot. Summ. J., Ex. 31.)  Finally, on February 8, 2010, less than two weeks prior to termination, Plaintiff's treating foot surgeon sent a letter to PHA specifically stating that due to continued wound healing problems as a result of his leg amputation, he is "unable to work" and that this inability to work would "continue at least another 6 months."[13]  (Id., Ex. 24.)  Ultimately, Plaintiff conceded that he never gave anyone at PHA a report from any physician, prior to his termination, indicating that he could work.  (Freeman Dep. 244:7–247:12.)  Indeed, even as of May 2010, Plaintiff's doctors opined that he could not return to a sedentary, desk job

---

[13]  Plaintiff argues that this letter is not dispositive, however, because Pasour and Carter had already determined that Plaintiff would be terminated prior to receipt of this letter.  This argument mischaracterizes the evidence.  As of early February 2010, Carter had only instructed Pasour to find out why Plaintiff could not return to work and if he could not return, he would be terminated.  (Pasour Dep. 51:15–16, 55;12–14, 61:19–23, 64:9–17.)  Pasour then sent Plaintiff a letter, dated February 4, 2010, giving him a new return to work date of February 8, 2010, meaning that had Plaintiff returned at that time, he would not have been terminated.  (Id. at 58:5–12.)  Accordingly, upon receipt of the physician's February 8, 2010 letter, no decision to terminate had yet to be made.

45

until June.  (Def. Pasour's Mot. Summ. J., Ex. 25.)  As no genuine issue of material fact exists as to Plaintiff's inability to return to work, he cannot establish adverse employment action.

Finally, even assuming that a reasonable factfinder could conclude that Plaintiff could return to work at the time of termination, Plaintiff's claim clearly fails at the third element of causation.  It is well established that temporal proximity that is "unduly suggestive" can advance the showing of causation at the summary judgment stage.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279–80 (3d Cir. 2000); see also Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) ("Even if timing alone could ever be sufficient to establish a causal link, . . . the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred.") (quotation omitted)).  Using time to satisfy the causation element of the prima facie case, however, requires consideration "with a careful eye to the specific facts and circumstances encountered."  Farrell, 206 F.3d at 279; see Williams v. Phila. Hous. Auth. Police Dept., 380 F.3d 751, 760 (3d Cir. 2004) (holding that two months was not "unduly suggestive"); Karaffa, 2013 WL 1157626, at *7 (holding that three and a half months was not "unduly suggestive").  "Indeed, for a causal connection to be made, the temporal proximity between the occurrences has generally been in terms of hours or days, not months."  Cullison v. Dauphin Cnty., Pa., No. Civ.A.10-705, 2012 WL 3027776, at *11 (M.D. Pa. May 18, 2012).

In the present matter, while Plaintiff repeatedly cites to a February 2010 expiration of his FMLA leave, the fact remains that Plaintiff's statutorily-mandated FMLA leave expired on August 31, 2009, and that any PHA-provided leave under which he continued was not statutorily protected.  Far from terminating Plaintiff, however, PHA waited another five and half months.  As set forth above, substantially shorter periods of time have been deemed insufficient to show

unusually suggestive temporal proximity.  Ultimately, the fact that PHA permitted Plaintiff to remain out on leave for a total of over eight months—despite the fact that the FMLA only provides for twelve weeks—substantiates a *lack* of retaliatory animus based on Plaintiff's use of FMLA leave.

In the absence of a very close temporal proximity suggestive of retaliation—as in this case—additional evidence of a causal connection is required to be produced, such as evidence of ongoing antagonism or inconsistent reasons for terminating the employee.  Williams, 380 F.3d at 760.  Plaintiff's efforts to do so, however, are unavailing.  First, Plaintiff offers two remarks that he claims are reflective of discriminatory animus.  The initial remark was Fred Pasour's alleged comment to him in January 2010 that "Mr. Greene don't like people like you hanging around." (Freeman Dep. 49:23–50:7.)  The other remark occurred after Plaintiff received the termination letter.  He called Thomas to ask her why she never scheduled him for an appointment and she said, "I have to talk to Fred.  This is not right."  (Id. at 201:15–202:1.)  Neither of these remarks are suggestive of discriminatory animus for several reasons.  As a primary matter, both remarks are somewhat amorphous in nature and Plaintiff admits that he did not understand what either individual meant.  (Id. at 50:8–10, 202:2–5.)  Moreover, Thomas's remark was made after termination and not indicative of any reason Plaintiff was terminated.  Further, Pasour's remark was made four months after the expiration of his FMLA leave while Plaintiff was still being retained by PHA, but had yet to provide any indication of when he could return to work.  Even then, Plaintiff was not terminated and was given another opportunity to return to work by February 8, 2010—an opportunity he did not take.  Finally, Plaintiff fails to recognize that, as of September 1, 2010, PHA was legally free to terminate Plaintiff's employment so long as their

reason was not simply because of Plaintiff's use of FMLA time.  Accordingly, remarks made subsequent to that time—particularly remarks made months later—in no way evidence a retaliatory motive.

Second, Plaintiff argues that there are inconsistencies in the reason for his termination. He claims that the termination letter states that he was fired because he *failed* to return to work, not that he was *unable* to return to work.  Plaintiff goes on to contend that "[t]he Defendants only attempt to justify the discriminatory decision to terminate the Plaintiff by contriving a non biased reason for the termination.  At a minimum, this is a disputed issue of fact that would foreclose judgment as a matter of law."  (Pl.'s Mem. Supp. Mot. Summ. J. 38.)

Aside from the confusing nature of Plaintiff's argument, Plaintiff appears to conflate an FMLA retaliation claim with a disability discrimination claim.  FMLA retaliation occurs when an employer discriminates against an employee for having used FMLA leave.  In this case, it is irrelevant whether PHA terminated Plaintiff for not returning to work or for being unable to return to work because of his disability.  Again, this is not a case where Plaintiff took FMLA plus extended leave and then returned to work, only to be fired, demoted or otherwise penalized in some fashion.  Nor has Plaintiff produced any evidence that during his leave, he was subject to any ongoing antagonism.  Rather, this was a case where Plaintiff took his full FMLA leave plus another five and half months and had not yet returned to work or even provided any medical evidence that he could do so.  Having failed to return to work, PHA had no obligation, at that juncture, to retain Plaintiff's position regardless of whether Plaintiff could not or simply did not return to work.

Finally, Plaintiff asserts that despite his efforts, "Defendants refused to schedule the

Case 2:12-cv-01422-RB Document 58 Filed 07/18/13 Page 49 of 53

[return to work physical] because Defendants had no intention of allowing Plaintiff to return to work." (Pl.'s Mem. Supp. Mot. Summ. J. 44.) He claims that he called Thomas in October 2009 about returning to work and Thomas informed him that she would have to first schedule an appointment with the PHA physician, but would have to first discuss it with Pasour. (Id.) He asserts that, prior to this conversation, he was not informed that he would be required to be examined by a PHA physician in order to return to work. (Id.) Thereafter, during his November 2009 conversation with Pasour, he indicated that he wanted to return to work. (Id.) Finally, upon receipt of Pasour's February 3, 2010 return to work letter, Plaintiff called Thomas several times to schedule an appointment to get a physical, and she repeatedly told him that she would have to confer with Pasour. (Id.) Ultimately, Plaintiff contends that PHA terminated him for failing to be cleared by the PHA physician when PHA employees foreclosed his ability to do so.[14] (Id.)

Again, however, this argument is misplaced. First, Plaintiff's claim that he did not know, prior to October 2009, that he needed to be examined by a physician in order to return to work is belied by: (1) the fact that on the three prior occasions he used FMLA leave, he was required to obtain a full duty release from his physician; and (2) the fact that he was informed of this fact in both his FMLA leave designation and the September return to work letter. Moreover, it is telling that despite the fact that Plaintiff's FMLA status expired on August 31, 2010, he did not contact

---

[14] Plaintiff claims that this constitutes "direct evidence" of retaliation. The Court disagrees. Thomas and Pasour's failure to set up an appointment for Plaintiff with a PHA physician—coupled with the absence of any evidence showing that it was their responsibility to do so—does not "demonstrate[] that the 'decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision'" to terminate Plaintiff. Walden, 126 F.3d at 513 (quotation omitted).

Thomas until September 28, 2009 to inquire about a return to work or a meeting with the PHA physician.  Further, despite his repeated declarations at his deposition that he could physically return to work as of September 2009, Plaintiff made no efforts after that conversation with Thomas to obtain medical clearance and resume his job duties until he received the February 3, 2010 return to work letter.  Finally, it is particularly notable that Plaintiff never sought to have his own physicians provide some sort of medical clearance in order to facilitate his full duty release.  Indeed, quite the opposite happened—Plaintiff's own physicians repeatedly opined that Plaintiff could not return to work.

Given the evidence of record, the Court finds that no reasonable juror could conclude that Plaintiff was retaliated against due to his use of FMLA leave.  Primarily, it is undisputed that Plaintiff never returned to work, either at the end of his FMLA leave in August, 2009, after receiving the first return to work letter in September 2009, or after receiving the second return to work letter in February 2009.  Under well-established legal interpretations of the FMLA retaliation provision, PHA's termination of Plaintiff was lawful.  Nonetheless, even if such events could somehow establish retaliation, Plaintiff failed to establish his prima facie case. Under the second element, Plaintiff could not show that he was able to return to work at the time of his termination, meaning that the termination was not an adverse employment action. Moreover, the undisputed facts of record allow for no inference of causation given the excessive temporal distance between the expiration of Plaintiff's FMLA leave and his ultimate termination after never returning to work.  In fact, a close examination of the record reveals that, far from retaliating against Plaintiff for his of FMLA leave, PHA made multiple efforts to accommodate Plaintiff's illness and to maintain his pay and benefits over the course of eight months.  Only

when Plaintiff ultimately did not—or could not—return to work did PHA terminate his

employment.  Because there is no genuine issue of material fact making any other finding

possible, the Court grants Defendant PHA's Motion for Summary Judgment and denies

Plaintiff's Motion for Summary Judgment as to the FMLA retaliation claim.

**C.      Claims Against Defendant Thomas**

The last claim remaining in this case is the claim of interference against Defendant Stacey

Thomas.  As with Defendant Pasour, Plaintiff claims that Thomas acted and indirectly in

furthering the interest of PHA with respect to the FMLA policy and, thus, is liable for FMLA

interference.

Given the foregoing discussion, this claim is easily dismissed.  As noted above, the Court

finds that Plaintiff has failed to prove—or even establish a genuine issue of material fact as

to—his interference claim.  The evidence of record clearly reveals that PHA, acting through

Thomas and Pasour, fulfilled its obligations under the FMLA and afforded Plaintiff additional

accommodation with respect to his illness.

Moreover, Plaintiff fails to establish that Thomas is an "employer" for purposes of FMLA

liability.  Plaintiff baldly argues, with citation to only his Amended Complaint, that Thomas

"exercised control over Plaintiff's leave of absence, his pay, as well as shared [with Pasour]

responsibility for labor and employee relations; salary and wage administration; work scheduling,

benefits administration; records management; human resources information system, hiring and

firing of PHA employees and the ADA 504; FMLA and other regulatory compliance programs."

(Pl.'s Mem. Supp. Mot. Summ. J. 48.)  Yet, all evidence of record reveals that Thomas exercised

no such control.  Plaintiff admitted that his supervisors at PHA included Pam Dunbar, Juanita

51

Maiga, Jackie Gardner, and Walter Norris, all of whom at some point were responsible for giving him working assignments, approving his sick and vacation time, and supervising and correcting his work.  (Freeman Dep. 14:5–19:12.)  No evidence exists that Thomas had any authority to hire and fire employees, give Plaintiff any work rules and assignments, set Plaintiff's conditions of employment, or control Plaintiff's employee records, including payroll, insurance, or taxes. Moreover, by all accounts Thomas had no final authority for decision regarding either the designation of Plaintiff's FMLA leave or Plaintiff's termination.  (Thomas Dep. 13:17–14:22, 31:15–24, 132:25–133:17, 182:16–20.)  Absent any evidence that Defendant Thomas was an "employer" for FMLA purposes, the Court cannot hold her individually liable.  Therefore, the claim against her is dismissed.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court enters judgment on the entirety of the Second Amended Complaint in favor of Defendants PHA, Thomas, and Pasour, and against Plaintiff Freeman.  As to Defendant Pasour, Plaintiff has failed to adduce any evidence either that Mr. Pasour was an "employer" under the FMLA or that he acted willfully with respect to any alleged interference with Plaintiff's FMLA leave, such that the claims against Pasour would come within the FMLA's statute of limitations.  As to Defendant PHA, Plaintiff has neither proven nor created a genuine issue of material fact on any interference by PHA with Plaintiff's FMLA leave or any retaliation by PHA due to Plaintiff's use of FMLA leave.  Finally, as to Defendant Thomas, she cannot be held liable both because Plaintiff has not established any interference claim and because she is not an "employer" under the FMLA.  In short, nothing in the record suggests that Plaintiff was in any way deprived of any of his rights under the FMLA or that

Plaintiff was terminated for any other reason other than the expiration of his leave time and the fact that he did not return to work.  While the Court certainly sympathizes with Plaintiff's poor health and ongoing medical issues resulting from his diabetes, Plaintiff simply has no remedy under the FMLA upon which the Court can grant him any relief.

An appropriate Order follows.